IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JR14, LLC, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No.  4:17-cv-1469 |
| ) | |
| JETCORP TECHNICAL SERVICES, INC. ) | |
| d/b/a FLYING COLOURS CORP., ) | |
| ) | |
| Defendants. ) | |

**COMPLAINT AT LAW**

JR14, LLC (hereinafter "JR14"), by and through its attorneys, Fox Galvin, LLC and Cozen O'Connor, for its Complaint against Defendant, JetCorp Technical Services, Inc. d/b/a Flying Colours Corp. (hereinafter "Flying Colours" or "Defendant"), states as follows:

I.      PRELIMINARY STATEMENT

1.      This is an action to recover approximately $1 million in damages resulting from Flying Colours' negligent pre-purchase inspection of a Lear 45 N708SP aircraft ("the Aircraft") on Plaintiff's behalf.  Flying Colours knew or should have known that the engines on the Aircraft were outdated and would need substantial upgrades, but never disclosed such information to Plaintiff.  Flying Colours also knew or should have known of other defects in the Aircraft prior to the Aircraft's purchase by JR14 which were not disclosed to Plaintiff.

2.      On January 12, 2016, JR14 filed suit against Flying Colours and another inspection service that it hired, Flight Check Business Aviation Services, LLC d/b/a Primestar Aviation ("Flight Check"), in the Circuit Court of Cook County, Illinois (the "Cook County Action").

3. Flying Colours filed a motion to dismiss for lack of personal jurisdiction in the Cook County Action, arguing that it was only subject to the jurisdiction of the Courts of Missouri.

4. Flying Colours' motion was granted on September 12, 2016, dismissing Flying Colours from the Cook County Action. The Cook County Action remains pending against Flight Check. Substantial discovery has now been completed in the Cook County Action.

5. JR14 brings this action against Flying Colours pursuant to the Missouri Savings Statute. MO. ANN. STAT. §516.230.

II. PARTIES AND JURISDICTION

6. JR14 is a Delaware limited liability company. Its principal place of business is Chicago, Illinois. At all relevant times, its members were Jerry Lasky and Rob Stein, both of whom are residents of the State of Illinois.

7. Flying Colours is a Missouri corporation. Its principal place of business is located in Chesterfield, Missouri.

8. Subject matter jurisdiction exists by virtue of diversity of citizenship, 28 U.S.C. §1332. The matter in controversy exceeds the sum or value of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs, and there is complete diversity of citizenship between the parties.

9. Venue is proper in this District under 28 U.S.C. §1391(a) because Flying Colours' principal place of business is in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District.

III.    FACTS COMMON TO ALL CLAIMS

   A.   **JR14 Hires Flying Colours to Inspect Aircraft Prior to Purchase**

10. On December 18, 2014, JR14 entered into a purchase agreement with David Instance ("Instance") and Tapetto Magico, Inc. ("Tapetto") to purchase the Aircraft. Section 2(a) of the purchase agreement detailed the specifications of the Aircraft that JR14 would receive:

| | |
|---|---|
| Airframe Manufacturer: | Learjet, Inc. |
| Airframe Model: | 45 |
| Current U.S. Reg. Mark: | N708SP |
| Serial Number | 45-014 (the "Airframe") |
| Engine Manufacturer: | Honeywell |
| **Engine Model** | **TFE 731-20AR-1B** |
| Engine Serial Numbers | No 1: P-111120 |
| | No. 2: P-111133 |

(*See* purchase agreement, attached as <u>Exhibit A</u>) (emphasis added).

11. The purchase agreement also contained a warranty in Sections 7(a)(v) and (vi), warranting that the Aircraft delivered to JR14 would conform to the specifications outlined above.

12. A Warranty Bill of Sale was executed by Instance and Tapetto, wherein it was represented to JR14 that the Aircraft was equipped with two (2) Honeywell model TFE-731-20AR engines ("AR Engines"). (*See* Warranty Bill of Sale, attached hereto as <u>Exhibit B</u>).

13. JR14 purchased a The Aircraft on January 28, 2015 for approximately $1.8 million ("Aircraft").

14. On the date of the purchase, FAA Type Certificate No. T00008WI (the "Type Certificate"), dated January 28, 2010, was in effect. (*See* Type Certificate, attached as <u>Exhibit C</u>).

15. To obtain "type certification" for a specific model of aircraft, the manufacturer submits an application to the FAA or other regulating body, describing that model of aircraft's design, equipment, and other specifications. The FAA or regulating body then reviews the

3

submitted information and determines whether the specifications meet applicable standards. If the FAA or regulating body determines that the design, equipment, and other specifications in the application are sufficient, a "type certificate" is issued. The type certificate thereafter sets the design, equipment, and specification standards for which all aircrafts of that particular model must conform in order to be declared "airworthy." All aircrafts must be declared "airworthy" prior to use.

16. The Type Certificate was submitted by the manufacturer of the Aircraft to the FAA and approved, certifying that all engines in Learjet Model 45 aircrafts, including the Aircraft, have been upgraded to either AR Engines or TFE-731-20BR engines.

17. Note 12 of the Type Certificate stated that "the 20R engine is no longer a supported installation. All aircraft engines have been modified to a 20AR or 20BR." (*See* Type Certificate, p. 14). Further, the Type Certificate expressly stated that the appropriate engines for a Learjet Model 45 aircraft are "Two Honeywell [AR Engines] or TFE731-20BR-1B turbofan engine." (*Id.*, pp. 1, 7).

18. Prior to purchasing the Aircraft, JR14 engaged Flying Colours to perform a pre-purchase inspection of the Aircraft. A copy of the pre-purchase evaluation contract between JR14 and Flying Colours (the "Pre-Purchase Agreement") is attached as Exhibit D.

19. JR14 retained Flying Colours to ensure that the Aircraft was in good condition, and to meet the requirements of its lender, US Bank, which required a pre-purchase report from Flying Colours that included, among other things, a complete listing of avionics package, engine times, airframe time and electronic record keeping plan, airworthiness certification, certificate of registration, and any other relevant requirements. JR14 advised Flying Colours of its lender's requirements.

4

20. Flying Colours performed its inspections of the Aircraft commencing in late December 2014 and continuing through January 2015.

21. Prior to performing its inspection, Flying Colours was aware or should have been aware that the purchase agreement called for JR14 to receive an aircraft equipped with AR Engines. Flying Colours also reviewed the Type Certificate, which stated that all Learjet Model 45 aircrafts contained AR Engines or TFE-731-20BR engines.

22. JR14 paid Flying Colours for its services.

B. **Flying Colours Fails to Discover and/or Disclose Material Deficiencies**

23. During the course of its inspection for JR14, Flying Colours reviewed materials and records regarding the Aircraft and represented to JR14 and JR14's lender that the Aircraft conformed to the Type Certificate and was in compliance with manufacturer's inspection and maintenance programs, as well as all Airworthiness Directives and Service Bulletins.

24. As discussed above, a type certificate sets the design, equipment, and specification standards for which all aircrafts of a particular model must conform in order to be declared "airworthy." All aircrafts must be declared "airworthy" prior to use.

25. Airworthiness Directives (ADs) are legally enforceable regulations issued by the United States Federal Aviation Administration (FAA) in accordance with 14 CFR part 39 to correct an unsafe condition in an aircraft.

26. Service Bulletins are notices to aircraft operators from a manufacturer notifying them of a product improvement, such as performing certain maintenance to improve the quality and performance of the engines on the Aircraft ("Service Bulletins").

27. Had the engines on the Aircraft conformed to the Type Certificate and complied with the Service Bulletins issued by the manufacturer, the Aircraft would have included and been equipped with two AR Engines.

28. Flying Colours' inspection was demonstrably deficient in several respects. Specifically, Flying Colours should have, but failed to, properly inspect, uncover, identify, and inform JR14 of numerous material deficiencies with the Aircraft during the pre-purchase inspection.

29. With regard to the Aircraft at issue, Note 12 of the Type Certificate represented that all Learjet Model 45 aircrafts had been updated to AR Engines or 20BR Engines. Further, the manufacturer of the Aircraft's engines issued Service Bulletins between 2004 and 2014 identifying numerous and significant improvements to the Aircraft's engines that, notwithstanding Flying Colours' representations and/or omissions, had not been complied with.

30. Rather, the Aircraft included and was equipped with two (2) obsolete and unsupportable Honeywell Engine Model TFE-731-20R engines ("R engines") that should have been updated pursuant to the Service Bulletins and Type Certificate years before Flying Colours' inspection.

31. Flying Colours knew or should have known that (i) JR14 contracted for and expected to receive an aircraft equipped with AR Engines; and (ii) the Type Certificate certified that all Learjet Model 45 aircrafts were now equipped with AR Engines. However, Flying Colours failed to communicate to JR14 that the Aircraft's engines were the obsolete and unsupportable "R" engines, instead of the "AR" engines.

32. Flying Colours was involved in substantial discussions relating to the issue with the Aircraft's engines. On January 12, 2015, Vic Valdes of Flying Colours wrote an email to Dean Eechaute, Field Service Representative of Bombardier/Lear Jet, stating, "I spoke with Honeywell (Mr. Wolf) and they are telling me that **these engines have not been modified to AR's based on the log book records. So Bombardier and the FAA need to come up with a**

6

**solution for this customer**." (*See* 1/12/15 email from Valdes, attached hereto as Exhibit E) (emphasis added).

33. That same day, Jack Wolf, a representative of Honeywell, wrote an email to Mr. Eechaute, stating "[t]alked to Vic [Valdes] and **we both agreed that engines are not 20-AR engines and have not been modified. Bombardier will have to address the [type certificate]**." (*See* 1/12/15 email chain, attached hereto as Exhibit F) (emphasis added).

34. Mr. Eechaute forwarded on Mr. Wolf's email, stating "[t]hese engines ARE-20R and have not been modified . . . It is not specific to the AR mod. It looks like we will have to do something to modify the [type certificate] on this." (Exhibit F) (emphasis added).

35. On January 13, 2015, Mr. Eechaute sent an email to Kirc Harris of Powerplant & Fuel System Engineering, which evidences Flying Colours' knowledge of the obsolete engines:

> **Talking to the chief inspector at Flying Colours. This issue was not noticed until after the sale of the aircraft. This is now a major issue since the aircraft is not per [type certificate]. The original owner is flying in and there will be a big meeting on this in a couple of hours. Vic Valdes (the chief inspector for [Flying Colours]) feels this could get ugly pretty quickly. On the original time line the plane was supposed to leave with the new owner this Friday. Time is of the essence here.**

(*See* 1/13/15 email, attached hereto as Exhibit G) (emphasis added).

36. On January 14, 2015, Scott Simpson of Bombardier/Learjet determined that the R Engine was a certified configuration for the Aircraft, and wrote a letter to Vic Valdes of Flying Colours stating that "[t]he TFE731-20R is a certified configuration for the aircraft as the engine is listed on the table on page 1 of the [Type Certificate]." (*See* 1/14/15 letter, attached hereto as Exhibit H).

37. Notwithstanding Mr. Simpson's determination that the R Engines were technically a legal configuration, Note 12 of the Type Certificate stated that "**the 20R engine is no longer a supported installation. All aircraft engines have been modified to a 20AR or**

7

**20BR**." (*See* Type Certificate, p. 14) (emphasis added). Further, the Type Certificate expressly states that the appropriate engines for a Learjet Model 45 aircraft are "Two Honeywell [AR Engines] or TFE731-20BR-1B turbofan engine." (*Id.*, pp. 1, 7).

38. Later on January 14, 2015, Lawrence Sadowski of the FAA wrote an email to Vic Valdes of Flying Colours, stating:

> **Obviously there is an issue with the statement on the [type certificate data sheet] about all engines have been modified and I have been working with the Wichita ACO on this issue. But as far as releasing the aircraft, you are ok there. They are listed on the [type certificate data sheet] as an acceptable engine.**

(*See* 1/14/15 email, attached hereto as Exhibit I) (emphasis added).

39. Flying Colours failed to timely disclose to JR14 that the Aircraft's engines were the obsolete and unsupportable R Engines instead of the AR engines.

40. As evidenced by the above correspondence, Flying Colours knew or should have known that JR14 contracted for and expected to receive an aircraft containing AR Engines. Flying Colours also knew or should have known that the Type Certificate represented that the Aircraft was equipped with AR Engines. However, once Flying Colours became aware that the Aircraft's engines were the obsolete and unsupportable R Engines instead of the AR Engines, Flying Colours failed to disclose this information to JR14.

41. Flying Colours failed to advise JR14 at any time regarding the Aircraft's engines.

42. Flying Colours failed to advise JR14 at any time that the Aircraft was not equipped with AR Engines as represented in the Type Certificate.

43. Note 12 of the Type Certificate—which states that all Learjet Model 45 aircrafts have been updated to AR Engines or 20BR Engines—was removed from the Type Certificate in February 2015, after JR14 had closed on the purchase of the Aircraft.

8

C.   **JR14 Discovers The Deficiencies After Purchasing The Aircraft**

44. In February 2015, after taking delivery of the Aircraft, JR14 engaged the services of Priester Aviation, which performed an inspection of the Aircraft. Its inspection revealed numerous problems and deficiencies (the "Deficiencies") with the Aircraft that were not discovered and/or discussed with JR14 by Flying Colours, including:

| **DEFICIENCIES** |
| --- |
| Weight & Balance inaccurate, off by over 1000 lbs. |
| Smoke goggles (emergency equipment) miss-matched and cracked. |
| Data transfer unit inoperable:  Made grinding noise first time powered up to a NAV data base load. |
| Life raft out of date and only 4 man capacity. |
| C & D inspections came due less than a month after closing. |
| LH IB seat track damaged. |
| Davtron clock will not dim:  Found bad ground on pin 1. |
| Hot liquid container inoperable. |
| Inclinometer inoperable:  Found broken pin on back of inclinometer. |
| Aft vanity mirror light inoperable:  Found bad power supply. |
| Co-pilots PFD blanked out:  Fuzzy and dim screen were noticed by the pilot on departure from pre-buy.  Unit completely failed two flights later. |
| EGPWS data base was expired. |
| 406 ELT had to be installed:  The installed unit was a hand held unit only.  This limited the aircraft to US operations only. |
| Crew seat Shoulder belts fraying. |
| Cabin seat belts not cotter keyed. |
| RH OB baggage panel cracked. |

9

| **DEFICIENCIES** |
|---|
| Painted emblem by passenger door. |
| Co-pilot audio box #1 comm. button will not latch. |
| AHRS units slow to spool up and 4 degree split:  Replacement of both AHRS unit required due to age of units. |
| Increased gross weight and increased zero fuel weight SB's. |
| Honeywell Phase IV avionics upgrade needed to comply with engine upgrades. |
| All life vests out of date and need recertification. |
| No lap top computer or patch cable for DEEC downloads came with aircraft. |

45. On or about February 2, 2015, JR14 notified Flying Colours of the Deficiencies discovered by Priester Aviation.

46. JR14 also learned from Priester Aviation in or around March 2015 that the Aircraft was not equipped with the AR Engines it had contracted for and that were represented in the Type Certificate as being equipped, but contained the inefficient, obsolete Honeywell model R engines.

47. JR14 has incurred significant costs and expenses as a result of Flying Colours' negligent misrepresentations, negligent inspection, and failure to identify basic, material problems with the Aircraft during its inspection.

48. Flying Colours' conduct caused JR to purchase the Aircraft at a greatly inflated value. JR14 also has been forced to expend significant sums to repair the Deficiencies that Flying Colours failed to uncover and/or disclose.

49. JR14 brings this lawsuit to remedy Flying Colours' inadequate and deficient inspections and services.

## COUNT I - NEGLIGENCE

50. JR14 realleges and incorporates paragraphs 1 through 49 above as if fully set forth herein.

51. Flying Colours owed JR14 a duty to exercise due care in the performance of its inspection of the Aircraft and to carefully, accurately, and properly perform its pre-purchase inspection and make any required disclosures of defects or deficiencies to JR14 .

52. Flying Colours also owed JR14 a duty to exercise due care in reviewing the Aircraft records and log books for conformance to the Type Certificate, and compliance with the applicable Service Bulletins and Airworthiness Directives, and to make any required disclosures of defects or deficiencies to JR14.

53. Flying Colours breached its duty to JR14 through its acts and omission by performing its inspection of the Aircraft and the Aircraft records and log books below the required level of care for inspections and services of the type performed by Flying Colours on the Aircraft, and by failing to make necessary disclosures to JR14.

54. Most notably, Flying Colours knew or should have known JR14 contracted for an aircraft with AR Engines and that the Type Certificate represented that the Aircraft had AR Engines. Despite discovering that the engines in the Aircraft were the obsolete R Engines, Flying Colours failed to disclose this information to JR14.

55. Flying Colours faulty and inadequate inspection of the Aircraft and its records and log books harmed JR14 because Flying Colours failed to discover, identify, and/or inform JR14 of basic and obvious deficiencies with the Aircraft, including that the engines were the obsolete and unsupportable R Engines, instead of the AR Engines that JR14 contracted for and that the Type Certificate represented were equipped.

56. Flying Colours' negligence directly and proximately harmed JR14.

11

57. JR14 would not have purchased the Aircraft, or, at a minimum, would have purchased it for significantly less than it paid, had it been aware of the deficiencies in Flying Colours' inspection.

58. Had it been aware of the deficiencies in Flying Colours' inspection, JR14 also would not have been required to expend significant sums to repair the Aircraft.

WHEREFORE, JR14 requests that this Court enter judgment in its favor and against Flying Colours in the amount proven at trial but in no event less than $100,000.00, and grant it any additional relief the Court deems just and proper.

## COUNT II - NEGLIGENT MISREPRESENTATION

59. JR14 realleges and incorporates paragraphs 1 through 58 above as if fully set forth herein.

60. Flying Colours is in the business of providing professional inspections of aircrafts in exchange for monetary compensation, and as such, Flying Colours had an obligation and duty to communicate all material information to JR14 in connection with JR14's purchase of the Aircraft.

61. Flying Colours also had an obligation and duty to communicate accurate information to JR14 regarding its inspection of the Aircraft, the Aircraft's compliance with Service Bulletins, and the Aircraft's conformance with the Type Certificate and the representations made therein.

62. Flying Colours failed to inform JR14 of Deficiencies with the Aircraft and/or falsely misled JR14 prior to its purchase of the Aircraft that all Service Bulletins for the Aircraft had been complied with, and that the Aircraft's specifications were in accordance with the Type Certificate.

63. Flying Colours was careless and negligent in ascertaining and disclosing the truth about the Aircraft.

64. Flying Colours intended to induce JR14 to purchase the Aircraft through its representations made in the course of its pre-purchase inspection.

65. JR14 justifiably relied on the truth of Flying Colours' representations by purchasing the Aircraft and informing its lender of the truth of Flying Colours' representations.

66. JR14 was damaged by Flying Colours' representations because the Aircraft's engines were obsolete, the Aircraft contained many other Deficiencies, resulting in JR14 greatly overpaying for the Aircraft, and being forced to expend significant costs to repair the Aircraft and upgrade the engines.

67. Had JR14 known the truth about the engine type, the Aircraft's failure to comply with all Service Bulletins, and the Deficiencies, it would not have purchased the Aircraft or, at a minimum, would have purchased it for significantly less than it paid.

WHEREFORE, JR14 requests that this Court enter judgment in its favor and against Flying Colours in the amount proven at trial but in no event less than $100,000.00, plus attorneys' fees and costs, and grant it any additional relief the Court deems just and proper.

## COUNT III - BREACH OF CONTRACT

68. JR14 realleges and incorporates paragraphs 1 through 67 above as if fully set forth herein.

69. The Pre-Purchase Agreement constitutes a valid, binding, and enforceable contract between JR14 and Flying Colours.

70. JR14 performed all of its obligations under the Pre-Purchase Agreement.

71. Flying Colours breached its obligations under the Pre-Purchase Agreement by failing to properly inspect the Aircraft in accordance with the terms of the Pre-Purchase Agreement and failing to make proper disclosures to JR14.

72. Flying Colours' breach of the Pre-Purchase Agreement caused the Deficiencies to go undiscovered by JR14 until after it purchased the Aircraft, including the Aircraft's lack of AR Engines as contracted for and as represented in the Type Certificate as being equipped.

73. Flying Colours' breach of the Pre-Purchase Agreement damaged JR14 in an amount exceeding $100,000.00.

WHEREFORE, JR14 requests that this Court enter judgment in its favor and against Defendant, Flying Colours, in the amount proven at trial but in no event less than $100,000.00, and grant it any additional relief the Court deems just and proper.

## COUNT IV- BREACH OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE TRADE PRACTICES ACT

74. JR14 realleges and incorporates paragraphs 1 through 73 above as if fully set forth herein.

75. Flying Colours' false representations and/or omissions regarding the Aircraft's engines and the Aircraft's compliance with applicable rules and regulations violated the Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 ILCS 505/1, *et seq.* (the "Consumer Fraud Act").

76. Flying Colours falsely represented and/or omitted to represent to JR14 that the Aircraft complied with all Service Bulletins and was in conformance with the Type Certificate, with the intent that JR14 purchase the Aircraft.

77. Flying Colours omitted to inform JR14 that the Aircraft did not contain the AR Engines that were contracted for and that were specified in the Type Certificate.

78. JR14 reasonably relied on Flying Colours' false representations and lack of disclosure in purchasing the Aircraft, and did not learn of the falsity of Flying Colours' representations until after the purchase was completed, the Aircraft was grounded, and a new inspection company reviewed the Aircraft.

79. Flying Colours' omissions and false assertions occurred in the course of conduct involving trade and commerce as they occurred in the course of JR14's purchase of the Aircraft.

80. JR14 is a consumer within the meaning of the Consumer Fraud Act and entitled to bring this claim against Flying Colours.  *See* 815 ILCS 505/1(b) (defining "merchandise" to include intangibles and services), (c) (defining "person" to include companies and businesses), and (e) (defining "consumer" to mean any "person who purchases or contracts for the purchase of merchandise…."). Here, JR14 purchased the services of Flying Colours.

81. JR14's reliance on Flying Colours' false representations and omissions caused it to incur actual damages in the amount exceeding $100,000.00, plus attorneys' fees, costs and expenses.

**WHEREFORE**, JR14 requests that this Court enter judgment in its favor and against Flying Colours in the amount proven at trial but in no event less than $100,000.00, plus attorneys' fees and costs, and grant it any additional relief the Court deems just and proper.

### COUNT V - BREACH OF THE MISSOURI MERCHANDISING PRACTICES ACT (IN THE ALTERNATIVE TO COUNT IV)

82. JR14 realleges and incorporates paragraphs 1 through 81 above as if fully set forth herein.

83. JR14 purchased the Aircraft for primarily personal, family or household purposes.

84. Flying Colours' false representations and/or omissions regarding the Aircraft's engines and the Aircraft's compliance with all applicable rules and regulations violated the

15

Missouri Merchandising Practices Act , Mo. Rev. Stat. §407.020 (2012) (the "Merchandising Act").

85. Through false representations and omissions, Flying Colours falsely represented to JR14 that the Aircraft complied with all Service Bulletins and contained AR Engines, with the intent that JR14 purchase the Aircraft.

86. JR14 reasonably relied on Flying Colours' omissions and false representations in purchasing the Aircraft, and did not learn of the actual condition of the Aircraft until after the purchase was completed, the Aircraft was grounded, and a new inspection company reviewed the Aircraft.

87. Flying Colours' omissions and false assertions occurred in the course of conduct involving trade and commerce as they occurred in the course of JR14's purchase of the Aircraft.

88. JR14 is a person within the meaning of the Act and entitled to bring this claim against Flying Colours. Mo. Rev. Stat. §§407.010, 407.020, and 407.025 (2012) (defining "merchandise" to include intangibles and services, and defining "person" to include companies and businesses). Here, JR14 purchased the services of Flying Colours.

89. JR14's reliance on Flying Colours' false representations and omissions caused it to incur actual damages in the amount exceeding $100,000.00, plus attorneys' fees, costs and expenses.

**WHEREFORE**, JR14 requests that this Court enter judgment in its favor and against Flying Colours in the amount proven at trial but in no event less than $100,000.00, plus attorneys' fees and costs, and grant it any additional relief the Court deems just and proper.

**Plaintiff Demands Trial by Jury**

Dated: May 8, 2017                                **JR14, LLC,**

                                              By: /s/ Richard B. Korn
                                                    One of Its Attorneys
                                                      FOX GALVIN, LLC
                                                      1 S. Memorial Dr., 12th Floor
                                                      St. Louis, MO 63102
                                                      (314) 588-7000
                                                      (314) 588-1965 (fax)
                                                      rkorn@foxgalvin.com

                                                      AND

                                                      Christopher E. Kentra*
                                                     Jeffrey B. Greenspan*
                                                     Corey T. Hickman*
                                                     COZEN O'CONNOR
                                                     123 North Wacker Drive, Suite 1800
                                                     Chicago, Illinois 60606
                                                     (312) 474-7900
                                                     (312) 474-7898 (fax)
                                                     *Pro Hac Vice Application Forthcoming*